NUMBER
13-09-00386-CV

 

                                        COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI - EDINBURG

                                                                     


 

IN THE
ESTATE OF ERNST B. FIEDLER, DECEASED

                                                                      

 

On appeal from the County Court at Law No. 1 

of Jefferson County, Texas.

                                                                  

 

MEMORANDUM OPINION

 

 Before Chief
Justice Valdez and Justices Rodriguez and Benavides

                      Memorandum
Opinion by Justice Benavides

 

Appellant, Tammy Laurie Leger,
contends the trial court erred in the underlying will contest lawsuit when it
denied her motion for directed verdict because there was insufficient evidence
to justify the jury’s findings of undue influence and fraud.  We affirm. 


I. Background[1]

            Ernst B.
Fiedler was born on November 16, 1926, the youngest of five siblings.  A World War II veteran, Fiedler spent most of
his life working on his family’s farm-and-ranch homestead in Hamshire,
Jefferson County, Texas.  According to
his niece Paula Fiedler, Ernst was a frugal, taciturn man who was “forthright”
and “strong-willed.”  He married Bessie Fiedler
in 1967.  Ernst and Bessie’s marriage
lasted for twenty years until she passed away in 1987.  They had no children.

Paula testified at trial that, over
the years, Ernst refused to prepare a will or final testament to dispose of his
personal property.  Paula testified that
she “would explain to him that it would be to his benefit to have some sort of will that would designate what to do with his property” and
“offered to take him to a lawyer.” 
However, according to Paula, Ernst stalwartly opposed the idea:

His response was,
over all the years with the family members, including my father and myself, was
that he really and truly didn’t give a blankety-blank-blank about having a will
and that, you know, it was going to be as it was.  He didn’t care about having a will.  He didn’t care what happened . . . . 

 

Paula testified that Ernst’s
“strong-willed” disposition changed in 2002, when he fell off the roof of his
garage and lay in his yard for approximately four to six hours in the dark,
cold night until someone found him.  At
this point, Paula stated that Ernst “became quite paranoid about being alone
and being sick or being injured.”  Ernst
was taken to the Veteran’s Administration (“VA”) hospital in Houston to
recuperate from this fall.  Ernst
convalesced at the VA hospital for a full year as his recovery was complicated by
his injuries from the fall and an ongoing fight with cancer.  He kept company with his brother Paul
Fiedler, Paula’s father, who was also undergoing treatment at the VA at the
same time.  While at the hospital, Paula
paid Ernst’s bills, cared for his property, and visited him regularly.

The record shows that Ernst met
Leger in July of 2002 at the VA hospital while he was still recuperating from
his surgery. Leger’s husband, David, was related to Ernst’s late wife
Bessie.  Leger testified that the next time she saw Ernst was when he
stopped by her home in Hamshire in May 2003.  Ernst began visiting Leger
regularly to have dinner and the two eventually became friends.  Leger
helped Ernst with his cancer medications by organizing them into a daily pill box.  She also gave him occasional rides to the VA
hospital for various doctor appointments. 


In approximately July of 2003,
Ernst and Leger drove around Jefferson County to visit Ernst’s numerous
properties.  Ernst owned several tracts of land, both
individually or jointly with other family members, throughout the
Hamshire/Winnie area.  Leger asked Ernst if he had a will.  Ernst
told Leger that “he did not have a will and did not intend to have a
will.”  In fact, Ernst proclaimed that he would “just let [his family] fight
over it.”  Leger told Ernst that if he did not prepare a will, the State
of Texas would decide how his property was disbursed.  Leger stated that
she “did not agree” with Ernst’s decision to not have a will and “thought he
should decide where his property goes. 
He worked for [his property]; he should decide.”  In her words, she continued to “fuss” about
Ernst getting a will, but he remained unconvinced.

Leger testified that she, of her
own volition, called Thomas Niederhofer, a local attorney, to discuss the
disposition of Ernst’s property in approximately July 2003.  Niederhofer had previously handled Leger’s
parents’ wills, and he had also handled some child custody issues for Leger’s
brother.  Leger testified that she discussed Ernst’s properties with
Niederhofer.  Niederhofer told her that he would need legal descriptions
of Ernst’s property to prepare a will and gave Leger directions about what to
look for and how to look for it.  Shortly thereafter, Leger drove Ernst to
the Jefferson County courthouse to research and make copies of the deeds to his
properties.  Leger testified that she “lifted the books” at the courthouse
to obtain the deeds, because Ernst was seventy-five years old at the time and
could not do so.  

Leger then scheduled a meeting
between Niederhofer and Ernst at her home.  The conversation regarding
Ernst’s will took place at Leger’s kitchen table, with Leger present the entire
time.  After meeting with Ernst, Niederhofer prepared Ernst’s will.
Niederhofer later called Leger, not Ernst, to inform her that Ernst’s will was
ready.  The record showed that Leger and Niederhofer agreed to execute the
will at Prosperity Bank in Winnie, Texas. 
Leger drove Ernst to the bank to execute his will and witnessed him sign
his will.

            




Ernst died on February 17, 2006, at
the age of seventy-nine.  When Ernst’s
will was probated, Paula and her father Paul discovered that Ernst had left his
entire estate to Leger.  Ernst had also
appointed Leger as the independent executrix of his estate.  In the event that Leger predeceased Paula,
Paula would be his independent executrix and inherit the estate.  Paul, Ernst’s brother, contested the will and
claimed that it was procured by Leger’s undue influence and fraud.  When Paul died, his daughter Paula assumed
his position in the will contest.  After
Paula concluded her case-in-chief during a trial on the merits, Leger moved for
a directed verdict, which the trial court denied.  At the end of the trial, the jury eventually found
that Ernst’s will was procured by undue influence and fraud.  In response, Leger filed this appeal.

II. Standard of Review 

“An appeal from the denial of a motion for directed verdict is essentially a
challenge to the legal sufficiency of the evidence.”  Fein v. R.P.H., Inc., 68 S.W.3d 260,
265 (Tex. App.–Houston [14th Dist.] 2002, pet. denied); see also Tex. Dep’t of
Protective & Regulatory Servs. v. Mulligan, No.
10-03-00254-CV, 2005 Tex. App. LEXIS 2370, at *3 (Tex. App.–Waco Mar. 24, 2005,
pet. denied) (mem. op.).  We thus review
the denial of a directed verdict by considering all
the evidence in the light most favorable to the non-movant,
disregarding all evidence to the contrary, and resolving all reasonable
inferences in favor of the non-movant.  Fein, 68 S.W.3d at 265; see also Mulligan,
2005 Tex. App. LEXIS 2370, at
**3-4.  To reverse the trial
court’s denial of a motion for directed verdict, appellant must show
that the evidence conclusively proves a fact that establishes appellant's right
to judgment as a matter of law and that there is no evidence to the contrary.  Mulligan, 2005 Tex. App. LEXIS 2370 at *4; Fein, 68 S.W.3d at 265.  Further,
“[i]n claims or defenses supported only by meager circumstantial evidence, the
evidence does not rise above a scintilla, and thus is legally insufficient, if
jurors would have to guess whether a vital fact exists.”  City of Keller v. Wilson, 168 S.W.3d 802, 813 (Tex. 2005).  

III. Analysis

            Leger, in
essence, asks this Court to overturn a jury verdict based on insufficiency of
the evidence.  We analyze each of the
issues the jury considered, undue influence and fraud, in turn.  

A.        Undue Influence

1.         Applicable Law       

Leger asserts that the trial court
erred in denying her motion for directed verdict because there was insufficient
evidence to show that she exerted undue influence over Ernst’s will.  To establish undue influence, the Texas
Supreme Court has stated that the party must show:  (1) the existence and exertion of influence;
(2) the effective operation of an influence so as to subvert the will or
overpower the mind of the grantor at the time of the execution; and (3) the
execution of an instrument the maker would not have executed but for such
influence.  Rothermel v. Duncan, 369 S.W.2d 917, 922
(Tex. 1963).  There must be some
evidence to show that the influence was not only present, but was exerted with
respect to making the instrument.  Id.; Cotten v. Cotten, 169 S.W.3d 824, 827 (Tex. App.–Dallas 2005, pet
denied).  Mere requests or efforts
to execute a favorable instrument are not sufficient to establish undue
influence unless the requests or efforts are so excessive so as to subvert the
will of the maker.  Curry v. Curry, 153 Tex. 421, 270 S.W.2d
208, 212 (Tex. 1954).  

Undue influence may be proven by
circumstantial, as well as direct, evidence. 
See Rothermel, 369 S.W.2d at 922; see
also Peralez v. Peralez, No.
13-09-0259-CV, 2010 Tex. App. LEXIS 4781, at **12-13 (Tex. App.–Corpus Christi
June 24, 2010, pet. denied) (mem. op.). 
“More often than not, undue influence is impossible to establish by
direct proof, and may only be shown by circumstances.”  In re Estate of Olson, 344 S.W.2d 171, 173-74 (Tex. Civ. App.–El
Paso 1961, writ ref’d n.r.e.). 
When determining a claim of undue influence, it is proper to consider
all evidence of relevant matters that occurred within a reasonable time before
or after the will’s execution.  Watson v. Dingler, 831
S.W.2d 834, 837 (Tex. App.–Houston [14th Dist.] 1992, writ denied).  

Fact-finders should consider the
following ten factors when determining the existence of undue influence:

(1)       the nature and
type of relationship existing between the testator, the contestants, and the
party accused of exerting such influence;

 

(2)       the
opportunities existing for the exertion of the type or deception possessed or employed;

 

(3)
     the
circumstances surrounding the drafting and execution of the testament; 

 

(4)       the existence of
a fraudulent motive;

 




(5)       whether there had
been a habitual subjection of the testator to the control of another;

 

(6)
     the state of
the testator’s mind at the time of the execution of the testament;

 

(7)
     the
testator’s mental or physical incapacity to resist or the susceptibility of the
testator’s mind to the type and extent of the influence exerted; 

 

(8)       words and acts
of the testator;

 

(9)       weakness of mind
and body of the testator, whether produced by infirmities of age or by disease
or otherwise;

 

(10)     whether the
testament executed is unnatural in its terms of disposition of property.

 

In re Estate of Graham,
69 S.W.3d 598, 609-10 (Tex. App.–Corpus Christi 2001, no pet.); see also Peralez, 2010 Tex. App. LEXIS 4781, at **13-14.

2.         Analysis

“When reviewing the evidence, this
Court may not substitute its judgment for that of the jury even if it disagrees
with the outcome.”  Mar. Overseas Corp. v. Ellis, 971 S.W.2d
402, 407 (Tex. 1998).  Here,
considering all the evidence in the light most favorable to Paula,
disregarding all evidence to the contrary, and resolving all reasonable
inferences in favor of Paula, there is considerable evidence from which a
reasonable jury could have found undue influence.  See Fein, 68 S.W.3d at 265.  

We analyze the
evidence by reviewing the factors set forth in Graham.  First, regarding the nature and type of relationship
existing between Ernst and Leger, we note that the two had only met fifteen
months prior to the execution of his will when Ernst  was undergoing cancer treatment and had
just experienced the frightening event of falling from his garage roof and
laying injured and alone for several hours on a cold, dark evening.  With regard to the second and fifth factors,
Leger had many opportunities to influence Ernst, as he frequently had dinner at
her home, she assisted him with his multiple medications, and she drove him to
Houston at various times to attend doctor appointments.  

According to Paula,
evidence of the third Graham factor is
the strongest in this case:  the
circumstances surrounding the drafting and execution of Ernst’s will.  Leger called Niederhofer, her family
attorney, to discuss the disposition of Ernst’s properties, even though Ernst
had made clear that he did not care to devise a will.  After Leger’s discussion with Niederhofer,
Leger took Ernst to the Jefferson County courthouse to research the legal
descriptions of all of his deeds.  Leger
then arranged to have Niederhofer meet Ernst in her home at her kitchen table
to discuss the preparation of a will. 
When Niederhofer completed Ernst’s will, he called Leger, not Ernst, to
schedule a time and place to execute the will. 
Leger drove Ernst to the place of the will’s execution and was also a
witness to its signing.

The fourth Graham factor, concerning fraudulent
motives, is obvious:  Ernst left his
entire estate to Leger, a woman whom he had only met fifteen months prior to
executing his will.  This fact also
implicates the tenth factor—“whether the testament executed is unnatural in its
terms of disposition of property.” 

 

The sixth, seventh,
eighth, and ninth factors are related:  all deal with the testator’s state of body and
mind.  Although Ernst was described as a
“forthright” and “strong-willed” man, the end of his life was defined by
illness and loneliness.  His wife had pre-deceased him; he was suffering from cancer; and he had
suffered some frightening events alone.  


There was more than a scintilla of
evidence to prove the elements of undue influence in this case.  See City
of Keller, 168 S.W.3d at 813.  We conclude that the jury could reasonably
conclude that Leger unduly influenced Ernst to devise his will to her advantage,
and we will not substitute our judgment for that of the jury.  See
Ellis, 971 S.W.2d
at 407.  

B.        Fraud

Leger also asserts the trial court
erred in denying her motion for a directed verdict because there was
insufficient evidence to show that she procured Ernst’s will by fraud.  

1.         Applicable Law

The elements of fraud are:  (1) that a material representation was made;
(2) the representation was false; (3) when the representation was made, the
speaker knew it was false or made it recklessly without any knowledge of the
truth and as a positive assertion; (4) the speaker made the representation with
the intent that the other party should act upon it; (5) the party acted in
reliance on the representation; and (6) the party thereby suffered injury.  See Aquaplex, Inc. v. Rancho La Valencia, Inc., 297 S.W.3d 768, 774
(Tex. 2009) (citing In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758
(Tex. 2001)).  

2.       Analysis

Here, Leger represented to Ernst that
the State of Texas would decide how his property was disbursed if he did not
have a will.  The record revealed that
Leger believed her statement to be true, even though she did not have any legal
training and was not familiar with the Texas Probate Code.  A jury could have believed that Leger either knew
this statement to be false or made it recklessly without any knowledge of its
truth.  Leger also acknowledged that she
“fussed” with Ernst to obtain a will. 
Again, the jury was certainly within its purview to find that Leger
represented that the State would decide how Ernst’s property would be disbursed
with the intent that Ernst would take her advice and obtain a will, which he
did.  

Further, there is ample evidence
that Ernst relied on Leger’s material representation, because he created a will
after a lifetime of refusing his family’s advice to do so.  As his niece Paula testified, Ernst “really
and truly didn’t give a blankety-blank-blank about having a will . . . he
didn’t care what happened. . . .” 
Ernst’s steadfast decision not to have a will, which he maintained for
over seventy years, changed once Leger represented that his property would be
disbursed by the State.

Again, we will not substitute our
judgment for that of the jury.  Ellis, 971 S.W.2d at
407.  We conclude that more than a
scintilla of evidence was presented at trial for a jury to conclude that fraud
occurred in the procurement of Ernst’s will. 
City of Keller, 168 S.W.3d at 813.  We
overrule Leger’s issue regarding the trial court’s denial of her motion for
directed verdict.

IV.  Conclusion

            Having
overruled Leger’s issue, we affirm the decision of the trial court

 

________________________

GINA
M. BENAVIDES,

Justice

 

 

Delivered and filed the

14th day of
April, 2011. 

 











[1] 
This case is before this Court on transfer from the Ninth Court of
Appeals in Beaumont pursuant to an order issued by the Supreme Court of
Texas.  See Tex. Gov’t Code Ann.
§ 73.001 (Vernon 2005).