

NUMBER 13-09-00386-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE ESTATE OF ERNST B. FIEDLER, DECEASED

**On appeal from the County Court at Law No. 1
of Jefferson County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides
Memorandum Opinion by Justice Benavides**

Appellant, Tammy Laurie Leger, contends the trial court erred in the underlying will contest lawsuit when it denied her motion for directed verdict because there was insufficient evidence to justify the jury's findings of undue influence and fraud. We affirm.

## I. BACKGROUND[1]

Ernst B. Fiedler was born on November 16, 1926, the youngest of five siblings. A World War II veteran, Fiedler spent most of his life working on his family's farm-and-ranch homestead in Hamshire, Jefferson County, Texas. According to his niece Paula Fiedler, Ernst was a frugal, taciturn man who was "forthright" and "strong-willed." He married Bessie Fiedler in 1967. Ernst and Bessie's marriage lasted for twenty years until she passed away in 1987. They had no children.

Paula testified at trial that, over the years, Ernst refused to prepare a will or final testament to dispose of his personal property. Paula testified that she "would explain to him that it would be to his benefit to have some sort of will that would designate what to do with his property" and "offered to take him to a lawyer." However, according to Paula, Ernst stalwartly opposed the idea:

> His response was, over all the years with the family members, including my father and myself, was that he really and truly didn't give a blankety-blank-blank about having a will and that, you know, it was going to be as it was. He didn't care about having a will. He didn't care what happened . . . .

Paula testified that Ernst's "strong-willed" disposition changed in 2002, when he fell off the roof of his garage and lay in his yard for approximately four to six hours in the dark, cold night until someone found him. At this point, Paula stated that Ernst "became quite paranoid about being alone and being sick or being injured." Ernst was taken to

---

[1] This case is before this Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to an order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005).

the Veteran's Administration ("VA") hospital in Houston to recuperate from this fall. Ernst convalesced at the VA hospital for a full year as his recovery was complicated by his injuries from the fall and an ongoing fight with cancer. He kept company with his brother Paul Fiedler, Paula's father, who was also undergoing treatment at the VA at the same time. While at the hospital, Paula paid Ernst's bills, cared for his property, and visited him regularly.

The record shows that Ernst met Leger in July of 2002 at the VA hospital while he was still recuperating from his surgery. Leger's husband, David, was related to Ernst's late wife Bessie. Leger testified that the next time she saw Ernst was when he stopped by her home in Hamshire in May 2003. Ernst began visiting Leger regularly to have dinner and the two eventually became friends. Leger helped Ernst with his cancer medications by organizing them into a daily pill box. She also gave him occasional rides to the VA hospital for various doctor appointments.

In approximately July of 2003, Ernst and Leger drove around Jefferson County to visit Ernst's numerous properties. Ernst owned several tracts of land, both individually or jointly with other family members, throughout the Hamshire/Winnie area. Leger asked Ernst if he had a will. Ernst told Leger that "he did not have a will and did not intend to have a will." In fact, Ernst proclaimed that he would "just let [his family] fight over it." Leger told Ernst that if he did not prepare a will, the State of Texas would decide how his property was disbursed. Leger stated that she "did not agree" with Ernst's decision to not have a will and "thought he should decide where his property

3

goes. He worked for [his property]; he should decide." In her words, she continued to "fuss" about Ernst getting a will, but he remained unconvinced.

Leger testified that she, of her own volition, called Thomas Niederhofer, a local attorney, to discuss the disposition of Ernst's property in approximately July 2003. Niederhofer had previously handled Leger's parents' wills, and he had also handled some child custody issues for Leger's brother. Leger testified that she discussed Ernst's properties with Niederhofer. Niederhofer told her that he would need legal descriptions of Ernst's property to prepare a will and gave Leger directions about what to look for and how to look for it. Shortly thereafter, Leger drove Ernst to the Jefferson County courthouse to research and make copies of the deeds to his properties. Leger testified that she "lifted the books" at the courthouse to obtain the deeds, because Ernst was seventy-five years old at the time and could not do so.

Leger then scheduled a meeting between Niederhofer and Ernst at her home. The conversation regarding Ernst's will took place at Leger's kitchen table, with Leger present the entire time. After meeting with Ernst, Niederhofer prepared Ernst's will. Niederhofer later called Leger, not Ernst, to inform her that Ernst's will was ready. The record showed that Leger and Niederhofer agreed to execute the will at Prosperity Bank in Winnie, Texas. Leger drove Ernst to the bank to execute his will and witnessed him sign his will.

Ernst died on February 17, 2006, at the age of seventy-nine. When Ernst's will was probated, Paula and her father Paul discovered that Ernst had left his entire estate to Leger. Ernst had also appointed Leger as the independent executrix of his estate. In the event that Leger predeceased Paula, Paula would be his independent executrix and inherit the estate. Paul, Ernst's brother, contested the will and claimed that it was procured by Leger's undue influence and fraud. When Paul died, his daughter Paula assumed his position in the will contest. After Paula concluded her case-in-chief during a trial on the merits, Leger moved for a directed verdict, which the trial court denied. At the end of the trial, the jury eventually found that Ernst's will was procured by undue influence and fraud. In response, Leger filed this appeal.

## II. STANDARD OF REVIEW

"An appeal from the denial of a motion for directed verdict is essentially a challenge to the legal sufficiency of the evidence." *Fein v. R.P.H., Inc.,* 68 S.W.3d 260, 265 (Tex. App.–Houston [14th Dist.] 2002, pet. denied); *see also Tex. Dep't of Protective & Regulatory Servs. v. Mulligan*, No. 10-03-00254-CV, 2005 Tex. App. LEXIS 2370, at *3 (Tex. App.–Waco Mar. 24, 2005, pet. denied) (mem. op.). We thus review the denial of a directed verdict by considering all the evidence in the light most favorable to the non-movant, disregarding all evidence to the contrary, and resolving all reasonable inferences in favor of the non-movant. *Fein*, 68 S.W.3d at 265; *see also Mulligan*, 2005 Tex. App. LEXIS 2370, at **3-4. To reverse the trial court's denial of a motion for directed verdict, appellant must show that the evidence conclusively proves a fact that

establishes appellant's right to judgment as a matter of law and that there is no evidence to the contrary. *Mulligan*, 2005 Tex. App. LEXIS 2370 at *4; *Fein*, 68 S.W.3d at 265. Further, "[i]n claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla, and thus is legally insufficient, if jurors would have to guess whether a vital fact exists." *City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005).

### III. ANALYSIS

Leger, in essence, asks this Court to overturn a jury verdict based on insufficiency of the evidence. We analyze each of the issues the jury considered, undue influence and fraud, in turn.

### A. Undue Influence

#### 1. Applicable Law

Leger asserts that the trial court erred in denying her motion for directed verdict because there was insufficient evidence to show that she exerted undue influence over Ernst's will. To establish undue influence, the Texas Supreme Court has stated that the party must show: (1) the existence and exertion of influence; (2) the effective operation of an influence so as to subvert the will or overpower the mind of the grantor at the time of the execution; and (3) the execution of an instrument the maker would not have executed but for such influence. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963). There must be some evidence to show that the influence was not only present, but was exerted with respect to making the instrument. *Id.*; *Cotten v. Cotten*, 169

6

S.W.3d 824, 827 (Tex. App.–Dallas 2005, pet denied). Mere requests or efforts to execute a favorable instrument are not sufficient to establish undue influence unless the requests or efforts are so excessive so as to subvert the will of the maker. *Curry v. Curry*, 153 Tex. 421, 270 S.W.2d 208, 212 (Tex. 1954).

Undue influence may be proven by circumstantial, as well as direct, evidence. *See Rothermel,* 369 S.W.2d at 922; *see also Peralez v. Peralez*, No. 13-09-0259-CV, 2010 Tex. App. LEXIS 4781, at **12-13 (Tex. App.–Corpus Christi June 24, 2010, pet. denied) (mem. op.). "More often than not, undue influence is impossible to establish by direct proof, and may only be shown by circumstances." *In re Estate of Olson*, 344 S.W.2d 171, 173-74 (Tex. Civ. App.–El Paso 1961, writ ref'd n.r.e.). When determining a claim of undue influence, it is proper to consider all evidence of relevant matters that occurred within a reasonable time before or after the will's execution. *Watson v. Dingler*, 831 S.W.2d 834, 837 (Tex. App.–Houston [14th Dist.] 1992, writ denied).

Fact-finders should consider the following ten factors when determining the existence of undue influence:

(1)     the nature and type of relationship existing between the testator, the contestants, and the party accused of exerting such influence;

(2)     the opportunities existing for the exertion of the type or deception possessed or employed;

(3)     the circumstances surrounding the drafting and execution of the testament;

(4)     the existence of a fraudulent motive;

7

(5)  whether there had been a habitual subjection of the testator to the control of another;

(6)  the state of the testator's mind at the time of the execution of the testament;

(7)  the testator's mental or physical incapacity to resist or the susceptibility of the testator's mind to the type and extent of the influence exerted;

(8)  words and acts of the testator;

(9)  weakness of mind and body of the testator, whether produced by infirmities of age or by disease or otherwise;

(10)  whether the testament executed is unnatural in its terms of disposition of property.

*In re Estate of Graham*, 69 S.W.3d 598, 609-10 (Tex. App.–Corpus Christi 2001, no pet.); *see also Peralez*, 2010 Tex. App. LEXIS 4781, at **13-14.

## 2.  Analysis

"When reviewing the evidence, this Court may not substitute its judgment for that of the jury even if it disagrees with the outcome." *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). Here, considering all the evidence in the light most favorable to Paula, disregarding all evidence to the contrary, and resolving all reasonable inferences in favor of Paula, there is considerable evidence from which a reasonable jury could have found undue influence. *See Fein*, 68 S.W.3d at 265.

We analyze the evidence by reviewing the factors set forth in *Graham*. First, regarding the nature and type of relationship existing between Ernst and Leger, we note that the two had only met fifteen months prior to the execution of his will when Ernst

was undergoing cancer treatment and had just experienced the frightening event of falling from his garage roof and laying injured and alone for several hours on a cold, dark evening.   With regard to the second and fifth factors, Leger had many opportunities to influence Ernst, as he frequently had dinner at her home, she assisted him with his multiple medications, and she drove him to Houston at various times to attend doctor appointments.

According to Paula, evidence of the third *Graham* factor is the strongest in this case:   the circumstances surrounding the drafting and execution of Ernst's will.   Leger called Niederhofer, her family attorney, to discuss the disposition of Ernst's properties, even though Ernst had made clear that he did not care to devise a will.   After Leger's discussion with Niederhofer, Leger took Ernst to the Jefferson County courthouse to research the legal descriptions of all of his deeds.   Leger then arranged to have Niederhofer meet Ernst in her home at her kitchen table to discuss the preparation of a will.   When Niederhofer completed Ernst's will, he called Leger, not Ernst, to schedule a time and place to execute the will.   Leger drove Ernst to the place of the will's execution and was also a witness to its signing.

The fourth *Graham* factor, concerning fraudulent motives, is obvious:   Ernst left his entire estate to Leger, a woman whom he had only met fifteen months prior to executing his will.   This fact also implicates the tenth factor—"whether the testament executed is unnatural in its terms of disposition of property."

The sixth, seventh, eighth, and ninth factors are related: all deal with the testator's state of body and mind. Although Ernst was described as a "forthright" and "strong-willed" man, the end of his life was defined by illness and loneliness. His wife had pre-deceased him; he was suffering from cancer; and he had suffered some frightening events alone.

There was more than a scintilla of evidence to prove the elements of undue influence in this case. *See City of Keller*, 168 S.W.3d at 813. We conclude that the jury could reasonably conclude that Leger unduly influenced Ernst to devise his will to her advantage, and we will not substitute our judgment for that of the jury. *See Ellis*, 971 S.W.2d at 407.

## B.    Fraud

Leger also asserts the trial court erred in denying her motion for a directed verdict because there was insufficient evidence to show that she procured Ernst's will by fraud.

### 1.    Applicable Law

The elements of fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *See Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)).

10

### 2.    Analysis

Here, Leger represented to Ernst that the State of Texas would decide how his property was disbursed if he did not have a will.   The record revealed that Leger believed her statement to be true, even though she did not have any legal training and was not familiar with the Texas Probate Code.   A jury could have believed that Leger either knew this statement to be false or made it recklessly without any knowledge of its truth.   Leger also acknowledged that she "fussed" with Ernst to obtain a will.   Again, the jury was certainly within its purview to find that Leger represented that the State would decide how Ernst's property would be disbursed with the intent that Ernst would take her advice and obtain a will, which he did.

Further, there is ample evidence that Ernst relied on Leger's material representation, because he created a will after a lifetime of refusing his family's advice to do so.   As his niece Paula testified, Ernst "really and truly didn't give a blankety-blank-blank about having a will . . . he didn't care what happened. . . ."   Ernst's steadfast decision not to have a will, which he maintained for over seventy years, changed once Leger represented that his property would be disbursed by the State.

Again, we will not substitute our judgment for that of the jury.   *Ellis*, 971 S.W.2d at 407.   We conclude that more than a scintilla of evidence was presented at trial for a jury to conclude that fraud occurred in the procurement of Ernst's will.   *City of Keller*, 168 S.W.3d at 813.   We overrule Leger's issue regarding the trial court's denial of her motion for directed verdict.

11

## IV. CONCLUSION

Having overruled Leger's issue, we affirm the decision of the trial court

 

_____

GINA M. BENAVIDES,
Justice

Delivered and filed the
14th day of April, 2011.

12